UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

        Plaintiff,                          Criminal No. 19-cr-20026

                                              HON. GERSHWIN A. DRAIN

v.

D-3 PHANIDEEP KARNATI,

        Defendant.

_____

**DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF DOWNWARD VARIANCE FROM ADVISORY GUIDELINE RANGE**
_____

### I.    Introduction and Background

On September 26, 2019, Phanideep Karnati plead guilty to a single count Indictment charging Conspiracy to Commit Visa Fraud and Harbor Aliens for Profit, in violation of 18 U.S.C. § 371. There was no Rule 11 agreement. The Probation Department calculated Mr. Karnati's guideline range to be 24 to 30 months. The parties stipulated the sum of $11,700 represents the total amount of forfeitable proceeds obtained as a result of this matter, based on 39 students who enrolled in Farmington University, for which Mr. Karnati was paid $300 per student. *See Stipulated Preliminary Order of Forfeiture, ECF No. 126, filed 12/6/19.*

1

Mr. Karnati immigrated to the United States on January 10, 2011, on an H-1B visa (a highly skilled work visa). He was never enrolled in Farmington University (FU), nor was his immigration status ever dependent on being a student there. Regardless of what sentence the court imposes, Mr. Karnati's wife and two minor children must leave the United States. That is because Mrs. Karnati and their 9-year-old son carry H-4 visas, which are issued to dependents of an H-1B visa holder. Mr. Karnati anticipates non-renewal of his H-1B visa in the next sixty days. Once Mr. Karnati's visa expires or becomes revoked, so will his wife and eldest son's. Mr. Karnati's 3-year-old son is an American citizen. For the following reasons, Mr. Karnati hereby requests a downward variance from the advisory guideline range, and the imposition of a sentence of time served.

II. **Circumstances of the Offense:**

**Karnati was an outlier in this offense and is substantially less culpable than his co-defendants.**

Unlike his co-defendants who were maintaining their immigration status through FU, Karnati has been lawfully present in the United States for the past nine years. Karnati was employed full-time in the field information technology, and supplemented his income by aiding students from India in applying to legitimate universities in the United States. *See PSIR, Paragraph 49.* Specifically, the interested student would contact Karnati,

2

they would discuss which universities would be the right fit, the student would complete the application and send it to Karnati, and Karnati would then forward the application onto the university. This is a legitimate service available to international students, and it is important to note Karnati declared this extra income on his 2018 tax return. *See PSIR, Paragraph 87.*

Karnati made his first contact with Santosh Sama over the telephone in approximately fall 2017, after which he added FU to the handful of schools to which he referred international students. The discovery in this case is replete with online correspondence between Karnati and respective students that show he was collecting applications for various universities, not only FU. Examples of this correspondence appear below:[1]

- November 2, 2017

*Preshanna Soudararaj (No. 1 on Karnati student list) contacts Karnati and tells him, "Applying for Campbellsville and other universities ... Pls forward the details of the Farmington and Ottawa universities."*

- November 3, 2017

*Shashank Pokala (No. 4 on Karnati student list) contacts Karnati regarding university application and Karnati answers, "For Campbellsville?" Student responds, "Farmington University."*

---

[1] *See Exhibit A for original correspondence (provided in discovery).*

- November 20, 2017

*Shivabharath Krishna Kamutam (No. 30 on Karnati student list) tells Karnati, "Need ur help for univ admission ... Pls guide me." Karnati sends student information about both Campbellsville and Farmington.*

- December 16, 2017

*Tejaswi Panuganti (No. 19 on Karnati student list) asks Karnati for an update "on the admission for Campbellsville and Farmington Universities." Karnati answers, "Farmington u will get Monday ... I will check on Campbellsville."*

Hence, Karnati was hardly the mastermind behind a scheme to send international students to a fake university. He was already referring international students to American universities when (unfortunately for him) he decided to add FU to that list. This is a stark contrast to the conduct of the other co-defendants in this matter.

Moreover, as stated in his guilty plea colloquy, Karnati believed FU offered online coursework. *See Guilty Plea Colloquy, ECF No. 121, filed 11/07/19 (Exhibit B)*. Conversations between Karnati's students and FU that were recorded and provided in discovery reveal these students believed FU offered online coursework.

- January 4, 2018

Tejaswani Panuganti (No. 19 on Karnati student list) calls FU to ask when classes begin.

   *FU:   We are currently full.  We don't have any classes to offer you, not even online ... what we can do for you to help you maintain your status,*

4

*we can enroll you as if you are a student here ... but you wouldn't be coming to class nor taking any online classes ...*

*Student:  But they didn't tell me about all this?  Because I am supposed to enroll ... in order to maintain my status ... Why was I not told about this?*

*FU:  I have no idea ...*

- February 5, 2018

Satish Kamaraj (No. 34 on Karnati student list) calls FU to ask when classes begin.

*Student:  Is there any chance to get me to know about my class schedule?*

*FU:  Can we do what?*

*Student:  My classes, when it's going to start do you know?  You have any idea?*

*FU:  Can you forward me the email that you got from [Phanideep]?*

*Student:  Yes I will try to do that.*

*FU:  You will try or you will?*

*Student:  I will try I mean right now I am driving so when I get a chance I will email you.*

*FU:  [Phanideep] was supposed to explain to you that we are completely full.  We don't have any normal classes to put you in ... you won't be going to any classes, are you aware of this?*

*Student:  I am going to take online classes.*

*FU:  No ... we don't have any online classes to offer you.*

5

*Student: I don't know that one actually ... let me think that now I don't know what to do now.*

*FU: And sir you are not driving right now so I mean I clearly can tell so if you want to send me that email that would be great ... Is this something that you want?*

*Student: I need to talk to [Phanideep] ... I don't know how the things happened.*

Because Karnati admitted in the guilty plea colloquy that he eventually learned student visas could not be maintained solely through online coursework, this does not exculpate him from the crime charged. *See Guilty Plea Colloquy, ECF No. 121, filed 11/07/19 (Exhibit B)*. However, the circumstances of his participation in the underlying conspiracy merit distinction from his co-defendants. *See PSIR, Paragraph 87.*

In total, 39 students who communicated with Karnati over a four month period -- from December 2017 through March 2018 – enrolled in FU. However, even after Karnati stopped referring students to FU, he still maintained contact with Sama, and on June 8, 2018, Karnati and Sama attended a meeting at FU. This was Karnati's first trip to Michigan.[2] During the meeting, undercover agent Ali Milani acknowledges FU was

---

[2] This meeting was recorded and provided in discovery. Defense Counsel was unable to obtain an official transcription of this meeting due to the heavy accents of the participants. *See Exhibit C (Statement from Court Reporters)*.

getting calls from Karnati's students "asking about classes." Milani tells Karnati, "at this point the campus has no room … our numbers are pretty high right now, like faculty to student ratio is very high." Karnati then tells Milani, "if you have any future plans of fortifying the university to the next level, then I [could] help." The following exchange then occurs:

*[10:20]   Karnati asks Milani, "how long this university is there?"*

*Milani answers, "We started back up 4-5 years ago ... we were just doing ... online to citizens."*

**[10:23]   Karnati asks, "the citizens, online classes they are all going on still?"**

**Milani answers, "Ya, ya, ya of course, of course."  (emphasis added)**

*Karnati says, "We can plan something like that [in Kentucky]."*

*Milani responds, "Definitely ... look how the University of Phoenix works ... they started with one region [doing] online classes and now [its] everywhere."*

Based on the foregoing, it is apparent Karnati believed FU offered online courses, and that it was going to expand its scope. This is a very different posture than Karnati's co-defendants, who were actually enrolled in FU and had direct knowledge of what it did and did not offer.³

---

³    It is during this meeting that Karnati provides an excel spreadsheet containing his list of students to Milani. Milani asks his assistant to cross check this list (which contains 74 students) with FU records. Milani's

As discussed above, Karnati stopped referring students to FU three months before this meeting took place, and he did not refer any student to FU after this meeting. But (unfortunately for him) he still believed FU was accredited and wanted to be part of "fortifying" the university. Toward this end, Milani called Karnati on December 8, 2018 (this was the one and only telephone conversation Karnati had with Milani). During the recorded conversation, Milani tells Karnati, "we have investors and we are trying to expand to California and other states." *See Exhibit E (Unofficial Transcript of Conversation)*. This was the reason Karnati returned to FU for a second meeting on January 30, 2019 (wherein he was subsequently arrested).

Blind-sided by his arrest at Detroit Metro Airport, Karnati immediately cooperated. During his post-arrest interview, Karnati naively explains to officers that FU offers easy online classes, perfect for housewives and working professionals. In fact, Karnati even explains he wanted to enroll his wife in FU.

*Detective: So are – is it online?*

*Karnati: It is online, yeah.*

---

assistant returns to the meeting with the list and confirms that, of the 74 students Karnati had corresponded with, only 39 actually enrolled in Farmington University. *See Exhibit D (Karnati student list)*. These 39 students formed the basis of the Stipulated Preliminary Order of Forfeiture. *See ECF No. 126, filed 12/6/19.*

8

> *Detective: For sure?*
>
> *Karnati: Yes.*
>
> *Detective: Positive?*
>
> *Karnati: Yeah.*

Frustrated by Karnati's ignorance, officers make the following remarks to Karnati:

> *"I keep asking you questions and you don't seem to know a lot about it."*
>
> *"It seems to me that I know more about the school than you do."*
>
> *"When I ask you about the University of Farmington, you are … I don't know, you don't know anything."*

*See Exhibit F (Transcript of Karnati Interrogation).* Karnati's obliviousness does not exculpate him from the underlying offense, but it does set him apart from his co-defendants. It is plain Karnati was an outlier in the underlying conspiracy, substantially less culpable than the rest. In his statement to the Probation Department, Karnati authentically explains how he came to be caught in the crosshairs of FU. *See Exhibit G (Karnati Statement to Probation).*

9

### III. History and Characteristics of Karnati

Karnati was the only child born to a modest family in a village in southern India in 1983. He obtained his bachelors degree in electrical and electronics engineering from the prestigious Jawaharlal Nehru Technological University in Hyderabad. For the last fifteen years, Karnati has been steadily employed in highly technical positions in the fields of information technology and data science, his salary and stature in this field growing with him. Karnati's on-the-job achievements and certifications are plentiful. *See Exhibit H (Work Recognition)*.

Karnati married his wife in 2009 and the family had their first child in 2010. In 2011, Karnati immigrated to the United States on an H-1B visa, which is a highly skilled work visa. His wife and oldest child were issued H-4 visas, which are issued to dependents of an H-1B visa holder. In 2016, the Karnati family had their second child, who is an American citizen.

Due to the underlying offense, Karnati's employment was terminated in February 2019 and he found himself unemployed for the first time in his life. Under enormous stress, Karnati continued to pursue his Master of Science degree (in Business Analytics), which he completed in August with a grade point average of 3.895. Upon graduation, Karnati enrolled in a doctoral degree program in Computer Engineering and Computer Science. He earned

a 4.0 in his first semester. *See Exhibit I (Academic Transcripts)*. Karnati finally secured employment as a data scientist in Connecticut, and has been commuting between Kentucky and Connecticut for the last several months. On December 16, 2019 (three days after his graduation walk), the Karnati family sold their Kentucky home and began preparations to return to India.

During the nine years he has lived in America, Phanideep has been an upstanding and valuable member of his Kentucky community. As the sole provider for his family of four, he still managed to send money to his parents in India, as well as make steady donations to charitable organizations. Phanideep also volunteers his time in the community, coaching children in Indian dance and organizing youth performances at cultural events (often performing with them). *See Exhibit J (Charitable Contributions)*. The letters of support Phanideep has received in preparation for sentencing describe a family man who is generous and charitable, sincere, hard-working, and above-all, devoted to his boys. *See Exhibit K (Community Letters)*. In short, here is an individual who has lived up to his potential and thrived on every opportunity he has been given. This is not someone who set out to scam the country that enabled him to succeed.

As a father, Karnati has poured all his time and energy into his family. His eldest son was admitted to a magnet program in second grade, and that

11

same year earned third place in Math Kangaroo (a statewide math competition). Hardhi Karnati is testing in high percentiles for reading and math, and last semester earned four A's and one B. He is as smart as his father. Although Hardhi has a black belt in taekwondo, he takes most pride in his chess game. Our chess champion has collected trophies from tournaments all over the state. *See Exhibit L (Hardhi Karnati Achievements)*. The youngest Karnati is just 3-years-old and has no comprehension of the changes ahead. Mrs. Karnati is soft-spoken, humble, kind, and loving. She has been a pillar of support for the family during this most difficult time.

### IV. Under §5H1.6, Karnati is eligible for a downward departure from the guidelines based on extraordinary family circumstances.

As discussed above, Karnati's H1-B visa is pending renewal. Mrs. Karnati and their eldest child have visas that are dependent on Phanideep's visa status, while the little guy is an American citizen. Since Karnati anticipates non-renewal of his H1-B visa, the family is prepared to depart the United States. If Karnati receives a custodial sentence, his family will have no choice but to leave the country without him. In addition to lacking his physical and emotional support as they return to India, the family will be without means in India since Karnati is the sole provider for his family.

12

Karnati's parents reside in the Indian state of Telangana, in a village that has no industry, no economy, and no educational opportunities. The nearest city is Hyderabad, which is ten hours away. This is where the Karnati family must move in order for Karnati to secure employment and the Karnati children to be educated.

Residents of Hyderabad are predominantly Telugu speaking. As discussed above, the elder Karnati son moved to the United States when he was one-years-old, and his three-year-old brother was born in the United States. Neither child speaks Telugu. Moreover, Mrs. Karnati (although college educated), has been a full-time mother and housewife for the last ten years. She has no means to earn an income, and nobody to care for the children even if she could find a job as an unskilled worker in Hyderabad.[4]

---

[4] According to the World Bank, India has among the lowest female labor force participants rates (LFPRs ) in the world. Less than a quarter (23.6%) of women aged 15 and above participated in the labor force in 2018. *See World Bank Group, "Labor Force Participation Rate, Female (% of Female Population Ages 15+) (Modeled ILO Estimate), India" (September 2019).* By comparison, China has over 64% of its women in the workforce, and in the United States, it is over 56%. Notably, in Hyderabad itself, violent crimes against women have become so prevalent that last month, Telangana Chief Minister K Chandrashekar Rao (KCR) announced that female employees should not work the night shift and that their duties must end by 8 pm. *https://timesofindia.indiatimes.com/city/hyderabad/no-night-duty-changing-rooms-for-women-staff/articleshow/72323354.cms*

Opportunities for the Karnati children to be educated without their father present are as dismal as Mrs. Karnati's ability to seek employment. To begin with, public schools are taught in the mother tongue of Telugu. But these schools have no facilities, no teachers, and no standards. They are predominantly attended by the children of Hyderabad's slum population. In order to maintain the primary education he began here in the United States, the eldest Karnati son would have to attend private school. In short, Karnati must seek gainful employment in India as soon as possible in order to support the family. There is just no way for these children to succeed without their father's presence.

Moreover, if Karnati were to receive a custodial sentence, he will eventually become unlawfully present in the United States. Under such circumstances, upon completion of his BOP sentence, Karnati would be transferred into custody of Department of Homeland Security (DHS) and held in detention. Once there, Karnati would need to wait months to see an immigration judge before he would be ordered removed from the United States. After a judge orders his removal, DHS would have to coordinate Karnati's physical removal to India. This process would remove Karnati from his family for a period of time that goes beyond whatever custodial sentence that may be contemplated by the guidelines.

Of course, the children will be unable to see Karnati while he is incarcerated or detained, as they will be back in India. In other words, the children will be effectively cut off from their father as they travel back and rebuild a life in India, guided only by a mother with no means to support this family. There is no way to quantify the magnitude of this hardship. *See PSIR, Paragraphs 74-77 ("Should [Karnati] be incarcerated, this may cause a substantial, direct and specific loss of essential caretaking and essential financial support to [his] family. Unlike most families, a term of incarceration for [Karnati] will not only result in caretaking and financial losses, the family will be required to move to another country.").*

Extraordinary family circumstances are widely accepted as a legitimate basis for imposing a below-guidelines sentence under §5H1.6. For example, in *United States v. Husein,* 478 F.3d 318, 335 (6th Cir. 2007), the Sixth Circuit affirmed the district court's downward departure from the advisory guidelines range of 37 to 46 months based defendant's family circumstances. Defendant and her mother provided for the financial and caretaking needs of defendant's incapacitated father and her three minor siblings. Judge Victoria Roberts sentenced defendant to a noncustodial sentence on her drug-distribution charge, telling her, "your family is going to benefit more by your presence than society is going to benefit from your

15

incarceration … [b]ut the sentence in no way is meant to minimize what you did and your participation in this crime." *Id.* at 324.

Similarly, in *United States v. Alba*, 933, F.2d 1117, 1122 (2d Cir. 1991), the Second Circuit upheld a downward departure based on family circumstances where the defendant supported his wife, two children, grandmother, and defendant's disabled father (sentencing range 41 to 51 months reduced to six months in halfway house and two years supervised release). Noting the special situation of this "close-knit family whose stability depends on [defendant's] continued presence," the sentencing court concluded that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit." *Id.*

In every circuit, courts are routinely "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir. 1992) (sentencing range 46 to 57 months reduced to six months home detention for single mother responsible for raising four young children). *See, e.g., United States v. Munoz-Nava,* 524 F.3d 1137, 1148 (10th Cir. 2008) (variance justified where defendant was primary taker and sole supporter of eight-year-old son); *United States v. Pena,* 930 F.2d 1486 (10th Cir. 1991)

(affirming downward departure where defendant supported infant and minor daughter with infant).

Moreover, when a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members. *United States v. Galante,* 111 F.3d 1029, 1035 (2d Cir. 1997) (acknowledging it is families of defendants that are the intended beneficiaries of downward departures on the ground of extraordinary circumstances relating to family responsibilities); *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir. 1992) ("rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing"). *See United States v. Schroeder,* 536 F.3d 746 (7th Cir. 2008) (remand ordered where trial court shifted family hardship analysis to defendant's culpability).

The same family hardships that are described above exist in Karnati's case. Karnati has a close-knit family whose lives will be uprooted regardless of what sentence the Court imposes. But separating Karnati from his young boys during this life-changing event for them could result in the destruction of an otherwise strong family unit. *See, e.g., United States v. Lehmann*, 513

17

F.3d 805 (8th Cir. 2008) (court imposed below-guidelines sentence because it concluded defendant's child would "decompensate emotionally," and suffer setback in overall development if mother were removed from his life). It would also debilitate the family financially, as any custodial sentence would delay Karnati's ability to even look for employment, let alone start working again.

This bleak scenario falls squarely under the extraordinary family hardship envisioned under §5H1.6. It is almost unthinkable to believe the children have any chance of succeeding in India without their father's emotional, physical, and financial support.[5]

---

[5] Karnati prepared a video collage of his family for the Court's review. https://www.youtube.com/watch?v=2xFLCrIzNEA&feature=youtu.be *(See Exhibit M)*. In it, Hardhi Karnati spells the longest word in the English language dictionary.

18

## V.  Conclusion

In sum, the hardship on Karnati's family is exceptional to a degree sufficient to take this case out of the heartland of cases contemplated by the sentencing guidelines.  When measured against a short custodial sentence and an unknowable amount of time in a DHS detention facility, the family hardship in this case is both exceptional and insurmountable.  Accordingly, Mr. Karnati respectfully requests this Court render a sentence of time served so that he and his family may immediately depart the country.

Respectfully Submitted,

/s/ Anjali Prasad
ANJALI PRASAD (P75771)
Prasad Legal, PLLC
117 W. Fourth Street, Suite 201
Royal Oak, MI 48067
(248) 733-5006
aprasad@prasadlegal.com

## CERTIFICATE OF SERVICE

      I hereby certify that I electronically filed the foregoing paper with the Clerk of the Court using the ECF system that will send notification of such filing to all registered parties.

                                                          /s/ Anjali Prasad
                                                          Anjali Prasad (P75771)