UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

            Plaintiff,

v.

D-3   Phanideep Karnati,

            Defendant.

No. 19-20026

Hon. Gershwin A. Drain

**Offense:**
18 U.S.C. § 371
Conspiracy to commit visa fraud
and harbor aliens for profit

**Maximum Penalty:** Up to 5 years

**Maximum Fine:** $250,000

**Supervised Release:**
Up to 3 years

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Phanideep Karnati, like his fellow conspirators, abused the United States student visa system to line his own pockets. Yet, Karnati is markedly different from his conspirators. Karnati chose to engage in criminal conduct even though he had already achieved what others desired; the ability to live and work in the United States with the possibility of a pathway to U.S. citizenship. Obviously for Karnati, that was not enough. Despite the fact Karnati was lawfully earning nearly $100,000.00 per year, he decided to knowingly recruit foreign students to the University of Farmington and several other schools, so that he could make more

money and his students could fraudulently remain and work in the United States. Accordingly, the United States of America respectfully recommends that the Court impose a sentence within Karnati's properly calculated guideline range of **24-30 months**. Such a sentence is necessary in light of the seriousness of the offense, the need to punish Karnati, deter Karnati and others from committing the same misconduct, Karnati's personal characteristics and to avoid unwarranted sentencing disparities.

## I.    BACKGROUND

Defendant Phanideep Karnati is a citizen of India who first traveled to the United States in 2010 on a B2 visitor's visa. (PSR ¶ 40). The following year, Karnati returned to the United States on a H1-B visa which allows companies in the United States to hire foreign workers for specialty positions. (PSR ¶ 40). In order to obtain and maintain his H1B visa, Karnati was required to have an employer-employee relationship with his petitioning employer. 8 C.F.R. § 214.2(h)(4)(ii)(2). While Karnati appears to have maintained an employee-employer relationship with various U.S. employers, Karnati decided to violate his H1B status by creating a cottage industry of services for foreign students. For example, he recruited foreign students for at least seven U.S. universities making money by charging students a fee to apply and to make more money and he assisted foreign students by facilitating the completion of their course assignments.

2

<u>UNDERCOVER OPERATION – THE UNIVERSITY OF FARMINGTON</u>

From February 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (PSR ¶ 10). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme. (*Id.* at ¶ 11). Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs; instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. (PSR ¶ 11-12).

While Karnati may have only admitted during his guilty plea (and in his statement to Probation) that he violated the statute by recruiting students to an *online* program knowing that foreign students must attend physical classes, the evidence described in the following paragraphs unequivocally demonstrate that Karnati knew that the University of Farmington had **<u>no</u>** classes. The evidence is clear that: Sama told Karnati there were no classes, the undercover agent told Karnati there were no classes, Karnati acknowledged there were no classes and Karnati told his own students there were no classes.

UNDERCOVER AGENTS LEARN THAT KARNATI IS RECRUITING STUDENTS WITH
SANTOSH SAMA

On December 19, 2017, a "student" traveled to the University and told agents that he had been recruited by "Phanidra Karnati". Unfamiliar with the name, the undercover agent emailed the school's most prolific recruiter, coconspirator Santosh Sama, to determine if Sama knew "Phanidra Karnati". Sama called the agent right away.

| | |
|---|---|
| Sama: | Yeah, Phani Karnati is one of the persons, he lives in Kentucky. |
| UC: | Oh yeah? |
| Sama: | Yeah, he sends me the documents of the students. |
| UC: | He sends you all these students? |
| Sama: | No, he send me around ah, for this January intake, he send around 24 or 26 something. |

(Excerpt December 19, 2017 recorded call)[1]

During that same conversation, the UCA expressed concern to Sama about whether Karnati was telling his "students" that the University of Farmington had no classes. Sama explained that the "student" wanted to visit the University even though there were no classes, ostensibly to verify its existence:

| | |
|---|---|
| Sama: | I spoke the same issue with Phani Karnati. He is a person… already told him but he wanted to look about the college whether |

---

[1] The facts revealed during this conversation, by itself, indisputably establish that Karnati was not entrapped by the government to conspire to commit visa fraud and harbor aliens for profit.

4

the college is real or not…Phani Karnati told him "if you still want to see the college that's up to you man….you can travel to Michigan that's up to you …but you don't have any classes, you don't have any orientation there. If you want any online classes, if you want to go for full time classes, just (unintelligible) use any other university." This is the thing I discuss with Phani. Phani discussing the students….who the students coming from Phani's side…he is explaining the same thing.

(Excerpt December 19, 2017 recorded call)

<u>KARNATI TELLS HIS STUDENTS THAT THERE ARE NO CLASSES AT THE UNIVERSITY</u>

On January 16, 2018, Karnati engaged in a WhatsApp chat with "Naveen" who wanted to transfer to the University of Farmington. Karnati confirms to "Naveen" (personal information redacted) that it was not necessary to attend school because the University of Farmington had no classes:



(Karnati "Chats", Message #1563 – iPhone forensic analysis 2/7/19[2])

<u>SAMA TELLS KARNATI *AGAIN* THAT THERE ARE NO CLASSES AT THE UNIVERSITY</u>

On January 22, 2018, coconspirators Sama and Suresh Kandala met with

---

[2] Based on an extensive review of Karnati's chat history, Karnati often used the letter "S" as a short-hand substitute for the word "Yes".

undercover agents (UCAs) at the University of Farmington to receive a $20,000 payment for recruiting students. Sama and Kandala returned to the school the following day.  During that meeting, on January 23, 2018, Sama explained to the UCA that Phanideep Karnati lives in Louisville, Kentucky and helps him recruit students. (*1/23/18 recorded meeting,* 10:13:54*).* Sama further stated that he paid Karnati $25,000 for recruiting students. (*Id.* at 10:58:20 – 10:59:33).

Despite the fact Sama had previously assured the UCA that Sama had told Karnati to inform "students" there were no classes at the University of Farmington (see above December 19, 2017), the UCA instructed Sama to call Karnati and make sure Karnati was telling his recruited students that the University of Farmington did not have classes. (*Id*. at 10:11:19).   In the UCA's presence, Sama immediately got on his phone and called Karnati.   The UCA was not able to understand Sama during the call because he spoke to Karnati in another language. However, after the phone call, Sama explained to the UCA that he told Karnati to make sure that he told his recruited students that the school had no classes. (*Id.* at 10:13:24 – 10:14:03).

### KARNATI RECRUITED 74 STUDENTS TO THE UNIVERSITY OF FARMINGTON

Throughout the January 23, 2018 meeting, Sama referred to a ledger he brought with him that identified each of the students he or his partners recruited. UCAs made a photocopy of the ledger and observed that Sama had written initials next to subsets of students. For example:

(*Sama ledger, Pg. 17 of 34*)

On June 4, 2019, during his guilty plea colloquy, Sama explained the significance

of the letters "ph" on the above-depicted document:

Mr. Waterstreet:    Then you have, you have "PH" next, next to some of the
names.

Sama:    The PH belongs to Phanideep Karnati.

Mr. Waterstreet:    So these are people that Mr. Karnati provided to you and
that you eventually referred to the school?

Sama:    Yes, sir.

(R.80: Sama Plea Tr., 268-269)

7

<u>KARNATI TELLS UNDERCOVER AGENT THAT HE KNOWS THERE IS NO CLASSES AT THE UNIVERSITY</u>

While Sama identified Karnati as a criminal conspirator during these meetings, agents had not yet directly communicated with Karnati.  However, on February 28, 2018, Karnati, using the alias "Amigo Nexus", emailed the University with a request to enroll fifty students:

**From:** Amigo Nexus
**To:** ali.milani@universityoffamington.edu
**Cc:** studentaffairs@universityoffarmington.edu; santoshreddy sama
**Subject:** Request for Acceptances
**Date:** Wednesday, February 28, 2018 8:03:56 AM

Respected Ali,

Good morning ! Hope all is well !

This is Phanideep Karnati , friend of Santosh Sama

Many students whom we have committed the March admission are at the verge of loosing their Jobs and Status. They waited so long trusting us !

I would please request you to give the acceptances at least for those top 50 people which Santosh has sent you in two list.

You help will definitely save so many lives and our credibility as well.

Thanks in advance ! Please help
Regards,
Phanideep
502-775-9375

On March 1, 2018, the UCA emailed Karnati back and advised him that the University had accepted 20 of the 50 students on his list, and would accept the remainder by the end of the day. Buoyed by his recruiting success, Karnati sought an in-person meeting with the UCA to discuss future recruiting efforts. The agent agreed and on June 6, 2018, Karnati and Sama met with UCA at the University of Farmington. Karnati is wearing a blue shirt in the photograph below.

8



After introducing himself and giving the UCA a brief background of his business activities, including the fact that he recruits students for other universities and owns a business in India that employs students with CPT, Karnati acknowledged that he knew the University of Farmington had no classes and admitted that he told his students there were no classes at the university. Below is an excerpt of the conversation:

UCA:      Let me ask you a question, I know you kind of know what we are doing here. What is your understanding of what we are doing here with me and Santosh?

Karnati:   (Laughs) No, that's fine.

UC:       But what is your understanding though?

Karnati:   Well I mean we place, you place a student and we maintain the status. Basically there…I have been working with so many students. I know many students.

UCA:      I know, but from what I understand, you do this for a lot of other schools too, right?

9

Karnati:       Right. Well not a lot…one or two….

UCA:           Several

Karnati:       Not even several, 3 to 4 others actually[3]. Basically, the students from India they already came here for the first master's, they must have (unintelligble) for the first master's. They get a good school for the second school, they can't stay.

UCA:           Right.

Karnati:       So different universities have different plans. For instance Farmington has one plan of . . .**without classes**, and (unintelligible)…

UCA:           So that is what we have been doing. I just want to make sure because I know originally when you had sent some people through we ended up getting calls from guys who were referred by you asking to go to classes and at that point we just didn't have any classes.

Karnati:       Oh, Yeah, Yeah. No, I know…

UCA:           We just wanted to make sure that first of all that line of communication is straight.

Karnati:       That line of communication is straight.

UCA:           We don't…like at this point, and Santosh knows too, we have so many students, we don't need any new students… obviously we didn't have the classes anything to offer them at that point and we just want people…you know, if they wanted to come here to maintain status, that's all. We would give them CPT,

---

[3] Karnati's statement that he recruited students for 3 or 4 other universities is belied by evidence found in his own records. For example, in phone chats, Karnati provided numerous recipients with the names of at least seven schools, including the University of Farmington, for which he could recruit. The United States has intentionally omitted the names of the six other schools.

whatever, but that was it, **we couldn't provide them classes**.

Karnati:    **I know**, actually out of 70-80 or more (UI) those students (UI), 1 or 2 people (UI) I must have forgot to told them…...

UCA:        I don't ever want a situation where a student is like, "I want to go to class." If you want to do that then…go ahead. And we ended up doing that for a couple people 'cause its like, well, transfer to Cumberland or Campbellsville, I just can't accommodate you right now.

(June 6, 2018 recorded meeting 9:35:31 – 9:37:35 – emphasis added)

During this meeting, Karnati and Sama touched upon various aspects of their joint recruitment activities. Later in the meeting the UCA asked about the number of students Karnati recruited.   Karnati pulled out his computer and opened an Excel spreadsheet, which he used to track his particular students. He referenced the spreadsheet during the ensuing conversation. As the meeting was winding down, Sama took photographs of Karnati's Excel spreadsheet. Sama then emailed the photographs to the UCA.   Karnati's spreadsheet, depicted below, listed seventy four (74) names.

 

ANOTHER EXAMPLE OF KARNATI TELLING STUDENTS THERE ARE NO CLASSES AT THE
UNIVERSITY

On March 25, 2018, Karnati, using (502) 775-9375, chatted with University of Farmington "student" Sreej Mudunuru[4], using ████████ (redacted personal information).   Karnati told Mudunuru that there were no classes:



_____

[4] Sreej Mudunuru is listed in row #51 on Karnati's Excel spreadsheet, above (right). As a reminder, Karnati often used the letter "S" as a substitute for the word "Yes".

(Karnati "Chats", Message #1515 – iPhone forensic analysis 2/7/19)

Karnati has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a)) and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371—without the benefit of a Rule 11 agreement, although the government did offer one. (PSR, ¶¶ 1, 7). Karnati's co-conspirators are the foreign citizen "students" he recruited and his subordinate recruiters - co-defendants. (*Id.* at ¶¶ 15-16).

The maximum sentence for his offense is not more than five years' imprisonment, a maximum fine of $250,000, and an applicable term of supervised up to three years. (PSR, p. 2; ¶¶ 61, 64, 68).

## II.   SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, the Court should use the Sentencing Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Indeed, a sentence within the guidelines range carries a "rebuttable presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th Cir. 2006). This is so because the guidelines "represent nearly two decades of considered judgment about the range of sentences appropriate for certain offenses." (*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the "sentencing experiences of individual judges, the administrative expertise of the

[Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
>> ***
> (6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct….

*18 U.S.C. § 3553(a).*

## A.    Karnati's Sentencing Guidelines

The government agrees with the Probation Department that Karnati's total offense level is 17 and his criminal history category is I, which results in a guideline range of **24–30 months**.

KARNATI WAS AN ORGANIZER, LEADER, MANAGER OR SUPERVISOR IN ANY CRIMINAL ACTIVITY

The United States expects Karnati to argue that the Probation Department erroneously assessed a 2-point enhancement for his role in the offense. To qualify for a 2-point enhancement under USSG § 3B1.1(c), Karnati must have organized,

14

led, managed or supervised one or more of the participants and the criminal activity must have involved five or more participants or was otherwise extensive. USSG § 3B1.1(c); cmt. 2. "The burden of proving when the enhancement is appropriate is low: "'[T]here need only be evidence to support a finding that the defendant was a manager or supervisor of at least one other participant in the criminal activity....' '"" *United States v. Beard*, 394 Fed. Appx. 200, 205 (6th Cir. 2010) (quoting *United States v. Henley,* 360 F.3d 509, 517 (6th Cir. 2004)). Control of subordinates is not necessary; Karnati need only supervise or manage them. *United States v. Johnson*, 736 Fed. Appx. 568, 572 (6th Cir. 2018).

In determining the defendant's organizational role, and distinguishing between a leader and manager, Application Note 4 of § 3B1.1 identifies a number of non-exhaustive factors the Court can consider, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See also United States v. Lalonde*, 509 F. 3d 750, 765-66 (6th Cir. 2007).

Here, beyond recruiting his seventy-four students to the University of Farmington in exchange for at least $25,000, Karnati advertised his services, charged

the "students" a fee, submitted the student's applications and other necessary documents to a co-conspirator, and counseled his "students" on the F1 student visa program.  As a result, a 2-point enhancement for Karnati's role in the offense is appropriate.

### Sentencing Reform Act factors

#### 1.    Seriousness of the offense

Karnati's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 54). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶¶ 9–15). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 15). The idea is that the students return to their native countries to share their new knowledge and skills for the betterment of themselves and their country. The seriousness of this offense is magnified because Karnati exploited the student visa system using his intimate familiarity with the rules.

If he receives a guidelines sentence, Karnati will be removed from the United States once he serves his sentence, and he will be permanently barred from returning to the United States in the future. And even without a permanent bar from a guidelines sentence, Karnati will likely be deported. Yet his likely deportation

should not trigger a variance windfall.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is not part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

### 2.    Nature and circumstances of the offense, deterrence, and protection of the public

Karnati may suggest his role in committing fraud and harboring illegal aliens for profit stemmed from his attempt to help foreign national students obtain an education—including for some students who sought to transfer from schools that were in danger of losing their accreditation. But his and his students' aims were not so noble.

Their true intent could not be clearer. While "enrolled" at the University, one

hundred percent of the foreign citizen students <u>never</u> spent a single second in a classroom. If it were truly about obtaining an education, Karnati would not have been able to recruit anyone to the University because it had no teachers, classes, or educational services. Instead, Karnati and the foreign nationals he recruited wanted to commit a fraud upon the United States.

Karnati is not a United States citizen and therefore his conduct and conviction could result in his removal from the United States. Thus, the likelihood of him reengaging this same criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not limited to whether the defendant is likely to be a recidivist. Rather, this Court, in determining an appropriate sentence, is required to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were certified to enroll international students.[5] A guideline sentence for Karnati would invariably serve as a warning and act as deterrence to any of the other one million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar conduct.

---

[5] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

Additionally, this action and the related actions—19-cr-20024 and 19-cr-20025—have garnered considerable media attention since the indictments were unsealed, including within the past few weeks as other co-defendants have been sentenced As a result, a strong sentence against Karnati would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Karnati and the other defendants had in recruiting students to the University, their vast network of students and potential students, at the very least, could be deterred by guidelines sentences.

In light of the above, a deterrent prison sentence between 24 and 30 months is appropriate.

### 3.    Characteristics of the defendant

Karnati indicated he has a loving and supportive family and friends, both in India and in the United States. (PSR ¶ 37-39). He attended a university in India and obtained a degree in electronic engineering and electronics, and he also earned a Master's degree from the University of Louisville. (PSR ¶ 48).   Karnati has also enjoyed consistent employment in the United States. (PSR 49-54). Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit the instant offense.

As a result, Karnati's personal characteristics counsel that a prison sentence of 24 - 30 months is appropriate.

### 4.    Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates

20

that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Therefore, this factor favors a prison sentence within the guidelines range of 24-30 months. However, the Court should also be mindful of the five other recruiters charged in this case, along with the two recruiters charged in related cases, 19-cr-20024 and 19-cr-20025. The most prolific recruiter, Santosh Sama, received a sentence of 24 months.  Bharath Kakireddy and Suresh Kandala, who were co-conspirators with Sama, each received a sentence of 18 months. Avinash Thakkallapally received a sentence of 15 months. Naveen Prathipati and Aswanth Nune, who each recruited less than twenty students, received a sentence of 12 months and a day.   Finally, Prem Rampeesa received a sentence of 12 months. Each of these sentences represented a downward variance from the guideline range. (PSR, Pg. 4).

## CONCLUSION

For the reasons stated above, the government recommends this Court sentence Karnati within the existing guideline range of 24–30 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

_s/Timothy P. McDonald_
Timothy P. McDonald
Ronald E. Waterstreet
Brandon Helms
United States Attorneys
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313) 226-0221
timothy.mcdonald@usdoj.gov

Dated: January 8, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2020, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will provide

notification to all counsel of record.

<u>/s/ Timothy P. McDonald</u>
Timothy P. McDonald
Assistant United States Attorney